UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WALLACE JOHN THOMSON,

    Petitioner,

vs.

DERRAL ADAMS, Warden,

    Respondent.

No. C 05-00074 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent moved to dismiss the petition as untimely and as mixed. The court concluded that although the petition was timely, it was mixed. In response to the options given him for dealing with this problem, petitioner asked for stay, which was granted. After petitioner exhausted the second claim in state court the stay was lifted. Respondent now has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court. Petitioner has responded with a traverse. For the reasons set out below, the petition is denied.

**BACKGROUND**

Petitioner was convicted by a jury in the Superior Court of the State of California in and for the County of Marin of two counts of rape, Cal. Penal Code § 288a(c)(2); two counts of forcible oral copulation, Cal. Penal Code § 289(a)(1); one count of residential burglary, Cal. Penal Code § 459; assault with intent to commit rape, Cal. Penal Code § 220; making criminal threats, Cal. Penal Code § 422; false imprisonment, Cal. Penal Code § 236; and assault with use of a weapon, Cal. Penal Code § 245(a)(1). Resp't Ex. 1 at

1108-12. He was found to have suffered a prior serious felony conviction and a prior strike, and to have served four prior prison terms. He was sentenced to prison for fifty years to life plus seventy-two years. *Id.* at 1103-05. He unsuccessfully appealed his conviction to the California Court of Appeal and the Supreme Court of California denied review. Resp't Ex. 5, 7. His state habeas petitions were denied.

These are the facts as set out by the California Court of Appeal:

*Prosecution Evidence Related to the Charged Offenses*

The victim met defendant and began dating him in approximately June 2000. The two of them had consensual sexual intercourse eight to ten times in the months leading up to September 12, 2000. Sometime in August 2000, the victim told defendant that she did not want to see him anymore because she had begun dating another man (Ted King), and because defendant told her he had another girlfriend. The victim also wanted to get out of the relationship because defendant appeared interested only in having sex with her, he had a criminal record, he seemed aggressive, and he frightened her.

On September 11, 2000, the victim went out to dinner with King. Afterward, the two went back to the victim's house and had intercourse in her room. The victim drove King home and then returned to her home at approximately 11:30 p.m. She fell asleep in her clothes on the bed. The victim woke up later to find someone straddling her, who struck her in the face. The assailant told her, "Don't make any noise or I'll beat you to death." Believing she recognized defendant's voice, the victim said "Is that you, Wally?" Defendant said "yes," hit her in the face again, and called her a slut and a whore.

Defendant instructed the victim to remove her clothes. The victim told him to think about what he was about to do and told him she would not tell anyone if he left, to which defendant replied, "Just do what I say. I could snap your neck." Defendant also flexed his muscles and told the victim he could break her ribs with one punch.

Defendant made the victim have intercourse with him. Afterward, the victim turned on the light. When defendant looked at her, he said, "look what I did to your face," and started to cry. The victim pleaded with him to let her go to the bathroom. Defendant agreed and assisted her there because she was dizzy and unable to walk by herself. When she was finished, he brought her back to the bedroom and instructed her to get on her hands and knees. He then had intercourse with her from behind.

After the second act of intercourse, the victim again asked to use the bathroom. Defendant took her there holding her in a headlock and threatening to snap her neck if she made any noise. When they returned to the victim's bedroom, defendant made her orally copulate him while he orally copulated her. Defendant also put his finger inside her anus and told her to do the same to him. Sometime later, he

2

ejaculated in the victim's mouth and she spit it out.

Defendant began wiping the door knobs and other items in the room with tissues. He removed a pillowcase that was covered in blood and began removing the sheet as well, but left it after the victim said it was expensive. He put the pillowcase and the used tissues inside a plastic bowl and told the victim to walk him to the front door. After he left, the victim locked the door behind him, and put on a bathrobe. She then woke her roommate Matt and his girlfriend Tara, and told them defendant had beaten and raped her. She then called King and 911.

As a result of the attacks, the victim suffered bruises to her arms and legs, and injuries to her back and neck. She also needed sutures to close cuts received on the inside and outside of her mouth.

The victim underwent a forensic medical exam at the hospital that revealed physical findings consistent with her version of the events. Blood found on defendant's sweatshirt matched the DNA profile of the victim's blood. Sperm collected on four vaginal swabs matched the DNA profile for King. However, sperm matching defendant's DNA profile was found in a stain on the victim's bed sheet. According to the prosecution's forensic expert, the large quantity of semen in this stain, when compared to the amounts of blood and saliva, was consistent with the sequence of events described by the victim and inconsistent with defendant's subsequent testimony that he struck the victim causing her mouth to bleed some appreciable time after the oral sex had occurred.

Defendant was interviewed by the police early in the morning of September 12, 2000. The videotape of the interview was played for the jury. In the interview, defendant said he had telephoned the victim sometime after midnight on September 12, and then drove to her house. He claimed the two of them engaged in several acts of consensual sex over a period of two or three hours and then he left. Defendant denied hitting the victim during his encounter with the victim, and repeated his denial many times throughout the interview. He informed the police he had been accused of this sort of behavior by a previous girlfriend, Sarah, who in 1998 had claimed that he had "held her hostage for five hours and beat her and raped her."

The prosecutor also introduced in evidence a letter defendant wrote while he was in jail awaiting trial in this case to another girlfriend (Lura Hajek), in which he acknowledged that his defense would be "fucked" if lab results, still pending, revealed that the stain on the victim's bed sheet contained a mixture of his semen and the victim's blood.

*Evidence Related to the Prior Uncharged Offenses*

Sarah testified that she had dated defendant for several years and that they had lived together in San Jose for a period of time. By March 1998, defendant had moved a residence to [sic] Novato, while Sarah stayed in San Jose. The two continued to see each other.

On Saturday, March 6, 1998, defendant came to spend the night with Sarah at her apartment, and the two of them had a discussion in which she told him she only wanted to see him on weekends because of

3

her school schedule. Defendant appeared to accept what she was saying, and afterward she went to take a shower. While she was drying herself off, defendant came into the bathroom naked and wanted to take a shower with her. Sarah declined because she had already finished her shower. Defendant looked downward, nodded his head and left the bathroom.

When Sarah went into the bedroom, she saw what she believed to be semen on the floor. She called out to defendant, asking what he had done in her room. Defendant responded by coming into the bedroom, picking her up by the collar of her bathrobe, and shoving her down on the bed. His jaw was clenched and he appeared very angry. He held her wrists over her head and wrapped his ankles around her, telling her, "Look what you've done to me. You've turned me into an animal. You're just like my mother. Why did you do this to me? Why did you string me along? Why didn't you just let me go a long time ago." He also told her, "It's all I can do not to break your fucking face." He then had her get down on her hands and knees and he had intercourse with her from behind. Sarah did not resist because he had threatened her with violence, because she knew he had been in prison for assault, and because she believed he would beat her unless she complied. In addition to raping her, defendant forced Sarah to orally copulate him while he did the same to her. He also put his finger in her anus.

After the assault, neither Sarah nor defendant slept. Throughout the night, defendant's mood would change from being angry, to one where he cried and was apologetic and for what he had done. He told her "What have I done, what have I done? I've raped you. Oh, my god, look what I've done."

In the morning, Sarah left for work. She did not call the police because she felt that defendant was right when he said she had strung him along. She explained that a good amount of time had passed before defendant's release from prison in December 1997 when she had not wanted to be with him anymore, but she had been too afraid of him to tell him so.

A few weeks after the assault, Sarah came home from work to find defendant at her apartment. She was afraid initially, but he appeared calm and their problems seemed solvable so she allowed him inside, and the two resumed their sexual relationship.

By the end of March 1998, defendant was acting unstable again. He was possessive and called Sarah numerous times a day. He also began drinking. In addition, Sarah became angry at him for using her gasoline credit card and failing to pay her back when the bill became due. On March 27, she reported the March 6 sexual assault to his parole officer. Over the next few days, defendant called her and told her to tell his parole officer that she had lied about defendant having assaulted her.

On March 30, 1998, defendant and Sarah argued over the phone because she did not want to go watch him play guitar at a club. At 3:00 a.m., she woke up to find defendant knocking on the sliding glass door in her bedroom. He cried that he had been stabbed and asked to be

4

admitted. Sarah admitted him and defendant went to the bathroom to clean up. She could smell alcohol on him. When he finished cleaning up, defendant entered the bedroom and said how uncaring and unloving she was. He crumpled a photograph he had sent her and threw the frame. He then got on top of her and hooked his ankles around her, and told her he could snap her neck in two.

Defendant went into the kitchen and consumed all of the medications she had in her cupboard. He also put a knife against his stomach and told her to kill him. Afterward, he took her back into the bedroom and forced her to orally copulate him. He also asked her to put her finger in his anus and had sex with her from behind. Sarah waited for him to pass out, thinking he would soon feel ill from all the medication he had swallowed. Eventually, he began vomiting in the bathroom.

Sarah got ready for school and asked him to leave. When he complained he had no money, she gave him some and he left, taking her cordless phone with him. Before he left, defendant sprayed Clorox over her mattress, saying, "I'm not going to let them get my DNA."

After defendant left, Sarah called her father and then 911. Defendant was arrested a day or two later. Almost immediately, Sarah began receiving letters from defendant. The prosecutor introduced many of these letters into evidence. Among other statements, defendant wrote "I'm hungry all day and all night and can't help but know this is what I deserve," "I honestly don't fully understand what caused me to do the things I did to you," "I never dreamed I could ever hurt you," "I know under no circumstances could I or would I behave in a violent manner towards you again," and "I'm the most horrible man in the world to let myself behave in such a way." None of defendant's letters accused Sarah of making false accusations against him.

Sarah eventually wrote back to him and accepted his telephone calls from prison. When asked why she wrote him and spoke to him on the phone, she responded, "I felt guilty." Upon his release from prison, she picked him up from the bus station and resumed a relationship with him for some period of time. She also acknowledged that she had written him graphic sexual letters while he had been in prison prior to December 1997. She said she had done this at his request. Some of these fantasy letters involved defendant forcing her to perform sex acts with him similar to the ones he forced her to perform in both of the March 1998 incidents.

No separate criminal charges were filed against defendant for the March 1998 incidents involving Sarah. However, defendant spent time in custody for a parole violation based on those events.

*Pertinent Evidence Presented by the Defense*

The defense attempted to attack the credibility of the victim through various witnesses. The victim's ex-boyfriend, Stuart Sommers, testified that the victim was not a truthful person. He testified that on one occasion she had punched him several times in the lip, causing him to bleed. The next day, she denied having hit him. Sommers also testified that the victim had told him to ignore the subpoena he had received to

5

testify at the trial in the present case. The defense also presented testimony from one of the victim's former roommates, Annabelle A., that on one occasion when she was 14 years of age, Annabelle had snorted cocaine in the company of the victim and several other persons. According to Annabelle, after the victim had snorted her line, she gestured to Annabelle to take her turn.

Defendant's trial testimony varied in several respects from the videotaped statement he had given the police. At trial, defendant claimed that on the morning of September 12, 2000, he and the victim had engaged in mutual oral sex and he ejaculated into the victim's mouth. He did not see the victim spit out the ejaculate. Afterward, the victim left the room and he began getting dressed to leave. When the victim returned, he told her he had made a mistake in coming to see her. He claimed that she responded by hitting him in the face with her fist while holding his car keys. In response, he shoved her in the face with an open palm. A struggle ensued, during which he pushed her on the bed and tried to restrain her. After she stopped struggling and he let her go, he noticed she was bleeding from the mouth. Using tissues and napkins, he helped her clean the blood off her face and clean her room, telling her over and over that he was sorry.

Defendant denied raping Sarah. He claimed Sarah had told him that she had lied to his parole officer about being raped because she was angry at defendant for being late in paying her back for his use of her gasoline credit card.

Resp't Ex. 5 (Unpublished Opinion of the California Court of Appeal, First Appellate District, *People v. Thomson*, No. A099176 (June 12, 2003)) at 1-7.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the

6

1  first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that
2  reached by [the Supreme] Court on a question of law or if the state court decides a case
3  differently than [the Supreme] Court has on a set of materially indistinguishable facts."
4  *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application
5  of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly
6  identifies the governing legal principle from the Supreme Court's decisions but
7  "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The
8  federal court on habeas review may not issue the writ "simply because that court concludes
9  in its independent judgment that the relevant state-court decision applied clearly
10 established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must
11 be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

12     Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual
13 determination will not be overturned on factual grounds unless objectively unreasonable in
14 light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at
15 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

16     When there is no reasoned opinion from the highest state court to consider the
17 petitioner's claims, the court looks to the last reasoned opinion.  *See Ylst v. Nunnemaker*,
18 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.
19 2000).

20 **DISCUSSION**

21     As grounds for federal habeas relief, petitioner asserts that his due process rights
22 were violated when (1) the Superior Court instructed the jury with CALJIC 2.50.01 and
23 2.50.02 regarding evidence of prior uncharged offenses, lessening the prosecution's
24 burden of proof; and (2) the prosecution suppressed potentially exculpatory evidence by
25 failing to submit a penile swab for testing.

26 **I.      Jury Instructions**

27     Petitioner claims that the trial court violated his due process rights by instructing the
28 jury with the 2001 revisions of CALJIC 2.50.01 and 2.50.02, which he contends allowed him

to be convicted of the charged offenses based on uncharged prior offenses which had been proven only by a preponderance of the evidence.

The state court of appeal concluded that the instructions did not violate due process and were correct statements of California law. Resp't Ex. 5 at 11 n.2; *see People v. Reliford*, 29 Cal. 4th 1007, 1009, 1016 (2003) (holding that the 1999 revision of 2.50.01 did not violate due process, and praising the 2001 revision in dicta as a further improvement on the 1999 version).

To obtain federal habeas corpus relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Id.* In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843 F.2d 314, 317 (9th Cir.), *cert. denied*, 488 U.S. 861 (1988). The court must inquire whether there is a "reasonable likelihood" that the jury erroneously applied the instruction in a way that violates the Constitution. *Estelle*, 502 U.S. at 72 & n.4.

The 2001 revision of CALJIC 2.50.01, given here, states:

> If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit the same or similar sexual offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime [or crimes] of which he is accused. ¶ However, if you find by a preponderance of the evidence that the defendant committed prior sexual offense[s], that is *not sufficient by itself* to prove beyond a reasonable doubt that he committed the charged crime. The weight and the significance of the evidence, if any, are for you to decide.

Resp't Ex. 1 at 962-63 (emphasis added). Similar language is used in instruction CALJIC 2.50.02 regarding evidence of prior domestic violence offenses. *Id.* at 965. Nowhere in the instructions do they state that the jury is allowed to convict the defendant of the charged

8

1 crime solely because of inferences arising from evidence of the prior offense.  Instead, by
2 specifically stating that evidence of a prior offense is insufficient to prove defendant's guilt
3 beyond a reasonable doubt, 2.50.01 and 2.50.02 make clear that jurors must consider
4 other evidence before convicting the defendant.  The instructions give such a specific
5 mandate that there is not a reasonable likelihood that the jury erroneously applied the
6 instruction in a way that violated the Constitution.

7 Petitioner correctly argues that due process protects the accused against conviction
8 except upon proof beyond a reasonable doubt of every fact necessary to constitute the
9 crime with which he is charged.  *In re Winship*, 397 U.S. 358, 364 (1970).  This prohibits
10 the State from using evidentiary presumptions in jury instructions that have the effect of
11 relieving the State of its burden of persuasion beyond a reasonable doubt of every
12 essential element of a crime.  *Yates v. Evatt*, 500 U.S. 391, 400-03 (1991).  In *Gibson v.*
13 *Ortiz*, 387 F.3d 812 (9th Cir. 2004), the court applied this principle and found that CALJIC
14 2.50.01, prior to the 1999 revision and coupled with 2.50.1, lessened the burden of proof by
15 allowing the "jury to find the [petitioner] committed the uncharged sexual offenses by a
16 preponderance of the evidence and thus infer that he had committed the *charged* acts
17 based upon facts found not beyond a reasonable doubt, but by a preponderance of the
18 evidence." *Id.* at 821-23.

19 Petitioner relies on *Gibson* as raising constitutional grounds "analogous to those
20 raised in this petition."  Pet. at 6-B.  However, the language of the 2001 revised instructions
21 distinguishes this case from *Gibson.*  387 F.3d at 814.  The *Gibson* court concluded that
22 the pre-revision instructions given in that case provided "two routes of conviction, one by a
23 constitutionally sufficient standard and one by a constitutionally deficient one."  *Id.* at 823.
24 When it is impossible to know which route the jury used, the unconstitutionality of one of
25 the routes requires that the conviction be set aside.  *Id.* at 825.  However, the revised
26 instruction tells the jury in unequivocal words that it cannot find petitioner guilty beyond a
27 reasonable doubt *just* because it had found by a preponderance of the evidence that he
28 committed prior bad acts, blocking off the constitutionally-deficient route.  Instructed with

9

the revised version of 2.50.01 and 2.50.02, it is not reasonably likely that the jury believed it could convict on a lower standard of proof than beyond a reasonable doubt.

The other instructions given to the jury also serve to support this conclusion. The jury was instructed as to the elements of each charged offense and told that a conviction required proof of each of those elements. *See*, *e.g.*, Resp't Ex. 1 at 985, 987. It was instructed to "consider all of the evidence bearing upon every issue regardless of who produced it." *Id.* at 967. The jury was instructed to not to "single out any particular sentence or any individual point or instruction and ignore the others" and to "[c]onsider the instructions as a whole and each in light of all the others." *Id.* at 941. While CALJIC 2.50.1 allows juries to consider evidence of past offenses only if proved by preponderance of evidence, the jury was also reminded that the prosecution bore the burden of proving the petitioner guilty beyond a reasonable doubt. *Id.* at 974. The instructions, taken as a whole, sufficiently insure that the jury examined all the evidence as to each element of each charged crime, regardless of who produced it, to determine whether defendant was guilty beyond a reasonable doubt. Given that juries are presumed to follow their instructions, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), there is no reasonable likelihood that the jury erroneously applied CALJIC 2.50.01 and 2.50.02 in a way that violates the Constitution.

Because 2.50.01 and 2.50.02 did not lessen the prosecution's burden of proof or allow the jury to convict solely based on inferences arising from evidence of the uncharged prior offense, the petitioner's due process rights were not violated and the state court's rejection of the claim was not contrary to, nor an unreasonable application of, clearly established Supreme Court law.

**II.     Prosecution Suppression of Exculpatory Evidence**

Petitioner claims his due process rights were violated when the prosecution failed to submit a penile swab taken during his police interview for DNA testing. He claims the swab is exculpatory under *Brady* because it might bear no trace of the victim's blood, disproving her version of events. The prosecution relied heavily on her credibility to convict him,

10

so petitioner claims that the result of a test, if it had shown no blood, would have severely weakened the prosecution case. Such a result, he claims, also would have supported his contention that she was injured after consensual oral sex.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.'" *United States v. Bagley*, 473 U.S. 667, 676 (1985).

Petitioner claims the *Brady* violation occurred when the prosecution failed to submit the swab for DNA testing and disclose the results, according to him despite defense counsel's request that the prosecution do so. The record shows that during a pre-trial hearing regarding discovery compliance, defense counsel asked about the petitioner's physical exam, including a swab taken, and requested access to the results. Resp't Ex. 2 at 60. Although not specifically mentioning the swab, the prosecution stated that various samples from the defendant were "in evidence" and "[defense c]ounsel's aware of that, so if there's anything they want to do with that, they can let us know." *Id.* at 62. Defense counsel makes no further mention of the swab at that time. At the same hearing, the court asked defense counsel to send an investigator to talk to the police officer who conducted the rape kit, *id*. at 64, demonstrating that petitioner had the opportunity to investigate the whereabouts of the sample. During questioning by defense counsel at trial, the officer answered affirmatively that he took biological evidence from the defendant, that these samples were in a refrigerator "somewhere," and that it would be "easy enough" to procure a list of the samples for the defense. *Id*. at 1097.

First, the United States Supreme Court has held that "the police do not have a constitutional duty to perform any particular tests." *Arizona v. Youngblood*, 488 U.S. 51,

11

58-59 (1988); *Hilliard v. Spalding*, 719 F.2d 1443, 1447 (9th Cir. 1983). To the extent petitioner's claim is that the prosecution did not perform the tests and turn over the results, it is without merit.

Second, plaintiff has utterly failed to carry his burden of showing that the swab was exculpatory. He has provided no evidence, only speculation, as to what it would have shown had it been tested.

Third, a defendant cannot claim a *Brady* violation if he was "aware of the essential facts enabling him to take advantage of any exculpatory evidence." *United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986); *see, e.g., United States v. Bracy*, 67 F.3d 1421, 1428-29 (9th Cir. 1995) (where government discloses all information necessary for defense to discover alleged *Brady* material on its own, government is not guilty of suppressing evidence). The record here establishes that petitioner was aware of the existence of the penile swab, and there is no indication that the government obstructed his ability to have it tested. Petitioner claims that the prosecution gave "the distinct impression that the results were forthcoming," leading him not to request the sample for further testing, but there is nothing in the record to support this claim. The prosecution does not once mention the swab specifically or express any affirmative plans to test the swab. Petitioner was aware of the essential facts that would enable him to take advantage of the purportedly exculpatory evidence, but simply failed to do so. The government did not suppress the swab, so there was no *Brady* violation. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (that the state suppressed evidence is an element of a *Brady* claim).

Finally, petitioner has not made a showing as to the materiality of the evidence, even if prosecution suppression is assumed. *See Bagley*, 473 U.S. at 676 (showing of materiality required for *Brady* claim); *United States v. Golb*, 69 F.3d 1417, 1430 (9th Cir. 1995) (ultimate question is whether there is reasonable probability that had material been disclosed, result of proceeding would have been different such that confidence in outcome is undermined); *United States v. Zuno-Arce*, 339 F.3d 886, 890-91 (9th Cir. 2003) (*Brady/Bagley* claim rejected because, even assuming that evidence was both favorable

12

and undisclosed, petitioner could not show prejudice because there was no reasonable probability that, had it been disclosed, the evidence would have made a difference to the outcome of the trial). Whether a "reasonable probability" exists may not be based on mere speculation without adequate support. *See Wood v. Bartholomew*, 516 U.S. 1, 6-8 (1995); *see*, *e.g.*, *Downs v. Hoyt*, 232 F.3d 1031, 1037 (9th Cir. 2000) (rejecting as speculative argument that withheld material might have led to some admissible evidence which might have been sufficiently favorable to meet the *Bagley* standard).

For one thing, petitioner cannot show materiality without showing what the results of the tests would have been. Without knowing the test results, it is impossible to evaluate the reasonable probability of a different outcome. Also, even assuming both suppression and that test results would have been what petitioner hopes, that evidence would not have been enough to establish a reasonable probability that had the material been disclosed, the result of proceeding would have been different. This is because other biological evidence available, including a semen/blood stain on the victim's bed sheet matching petitioner's DNA profile, was introduced into evidence. Resp't Ex. 2 at 1043-45, 1055-56. The sheet stain was consistent with the victim's testimony. Even if the penile swab had been tested and had not shown any blood, the inference that petitioner wants to draw from this, that the victim was untruthful, would have been dramatically weakened by the existence of the sheet stain consistent with her story.

The defense also introduced evidence attacking the credibility of the victim, including testimony from the victim's ex-boyfriend stating that she was not a truthful person, evidence that was much stronger than the hypothetical result of the penile swab, contradicted as it would have been by the sheet stain, ever could have been. Resp't Ex. 2 at 1125. This tends to support the conclusion that the hypothetical result would not have been material. *See Morris v. Ylst*, 447 F.3d 735, 741 (9th Cir. 2006) (no *Brady* violation for potentially impeaching lost letter where defense had other significant impeachment evidence against witnesses). The record also shows that there was other compelling evidence of petitioner's guilt. *See Morris*, 447 F.3d at 741 (no *Brady* violation where there was "compelling

13

evidence" in the form of confession to other people and blood-splattered jeans); *Wood*, 516 U.S. at 8 (no *Brady* violation where prosecution failed to disclose results of polygraph test because even without testimony in question case against defendant was "over-whelming"). The prosecution introduced the stain from the victim's bed sheet consisting of petitioner's semen, saliva and the victim's blood and expert testimony stating the stain was consistent with the victim's version of the alleged crime, resp't ex. 2 at 1043-45; evidence of the physical condition of the victim, *id.* at 821-22, 831-32; a letter written to his girlfriend stating he was "fucked" if the mixture on the bed sheet (not the swab) included the victim's blood, *id.* at 1458; testimony from the victim, *id.* at 501-525; and testimony a past girlfriend who claims he also sexually assaulted her. *Id.* at 701-07. That the sample was not tested does not undermine confidence in the outcome of the trial.

Because there is no right to have the prosecution perform any particular tests, and because the prosecution here did not suppress the swab and the petitioner has not shown that the swab was material, there was no due process violation under *Brady* and the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated:  August 5, 2008.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.05\THOMSON074.RUL.wpd